*State of Maryland v. Tavon Brand*, No. 2441, September Term 2023. Opinion by Eyler, James R. Filed March 31, 2025.

**CRIMINAL LAW – POST CONVICTION – INEFFECTIVE ASSISTANCE**

In 2018, Tavon Brand, appellee, pleaded not criminally responsible ("NCR") in the Circuit Court for Baltimore City to charges of murder in the first degree and related handgun offenses. The case was scheduled for trial on June 19, 2019. Trial counsel was unable to obtain an expert's report supporting Mr. Brand's NCR defense in time to satisfy a discovery deadline. On the day of trial, the trial court denied trial counsel's request for a postponement. At that time, without evidence to support his NCR defense and following the advice of trial counsel, Mr. Brand waived his right to a jury trial, believing that he could not plead guilty and also preserve a right to have a jury trial at a later time on his NCR defense. Thereafter, the circuit court held a bifurcated bench trial.

At a bench trial, the court found Mr. Brand guilty of the actus rei of two counts of first-degree murder; two counts of use of a firearm in the commission of a felony or crime of violence; possession of a firearm after having been convicted previously of a disqualifying offense; and wearing, carrying, or transporting a handgun on his person.

In September 2019, the court held a separate trial to determine criminal responsibility. After hearing testimony from, among others, the defense psychiatric expert whose tardy report had precipitated Mr. Brand's waiver of jury trial, the court found him criminally responsible for the offenses and imposed sentences. We affirmed the judgments on direct appeal. *Brand v. State*, No. 2048, Sept. Term, 2019 (filed Dec. 15, 2020) (per curiam).

In 2023, Mr. Brand filed a postconviction petition asserting ineffective assistance of counsel by, *inter alia*, failing to file timely the defense expert's opinion and report on criminal responsibility and failing to advise Mr. Brand that he could plead guilty and then receive an NCR jury trial. The postconviction court granted Mr. Brand's petition.

On appeal, Mr. Brand argued that we should presume prejudice based on the lost opportunity to have his case decided by a jury.

Assuming that there was ineffective assistance, we hold that, in a postconviction context based on ineffective assistance, prejudice is not presumed, the *Strickland v. Washington*, 466 U.S. 668 (1984), standard applies, and Mr. Brand made no attempt to show actual prejudice.

Circuit Court for Baltimore City
Case No. 118130033

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 2441

September Term, 2023

_____

STATE OF MARYLAND

v.

TAVON BRAND

_____

Reed,
Tang,
Eyler, James R.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, James R., J.

_____

Filed: March 31, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In 2018, Tavon Brand, appellee, pleaded not criminally responsible ("NCR") in the Circuit Court for Baltimore City to charges of murder in the first degree and related handgun offenses. Mr. Brand did not deny shooting the victims. The case was scheduled for trial on June 19, 2019. Trial counsel was unable to obtain an expert's report supporting Mr. Brand's NCR defense in time to satisfy a discovery deadline. On the day of trial, the trial court denied trial counsel's request for a postponement. At that time, without evidence to support his NCR defense and following the advice of trial counsel, Mr. Brand waived his right to a jury trial, believing that he could not plead guilty and also preserve a right to have a jury trial at a later time on his NCR defense. Thereafter, the circuit court held a bifurcated bench trial.

The guilt-phase trial commenced the day after Mr. Brand waived his right to a jury trial. Upon its conclusion, the court found Mr. Brand guilty of the actus rei of two counts of first-degree murder; two counts of use of a firearm in the commission of a felony or crime of violence; possession of a firearm after having been convicted previously of a disqualifying offense; and wearing, carrying, or transporting a handgun on his person.

Three months later, in September 2019, the court held a separate trial to determine criminal responsibility. After hearing testimony from, among others, the defense psychiatric expert whose tardy report had precipitated Mr. Brand's waiver of jury trial, the court found him criminally responsible for the offenses. In November 2019, the court sentenced Mr. Brand to consecutive terms of life imprisonment, with all but thirty years suspended, for each count of first-degree murder, as well as other concurrent terms of

imprisonment. We affirmed the judgments on direct appeal. *Brand v. State*, No. 2048, Sept. Term, 2019 (filed Dec. 15, 2020) (per curiam).

In 2022, Mr. Brand, pro se, filed a postconviction petition, and the following year, with the assistance of counsel, a superseding petition, raising three claims of error (which we have paraphrased):

> 1. Trial counsel provided ineffective assistance by failing to file timely the defense expert's opinion and report on criminal responsibility.
>
> 2. Trial counsel provided ineffective assistance by failing to advise Mr. Brand that he could plead guilty and then receive an NCR jury trial.
>
> 3. Trial counsel provided ineffective assistance by failing to file timely a motion for modification of sentence.

Following a hearing, the circuit court issued an opinion and order, granting Mr. Brand's petition as to all three claims. The State filed an application for leave to appeal, challenging the postconviction court's rulings on the first two claims. We granted the application and transferred the matter to the regular appellate docket.

The State now raises three questions for our review:

> 1. Did the postconviction court err in finding that trial counsel was ineffective for failing to timely obtain and disclose an NCR expert's opinion and report where the delay was caused by the expert and trial counsel reasonably relied on the court's assurance of a future postponement?
>
> 2. Did the postconviction court err in finding that trial counsel was ineffective for counseling [Mr.] Brand to elect a bench trial rather than a guilty plea where [Mr.] Brand was precluded from presenting an NCR expert to a jury?

3. Did the postconviction court err in finding that trial counsel was ineffective where it failed to apply the appropriate prejudice standard required under *Strickland*[1] and its progeny?

The answer to the third question is dispositive. We hold that the postconviction court applied the wrong prejudice standard in assessing whether trial counsel was ineffective, and furthermore, applying the correct standard, we conclude that Mr. Brand failed to establish prejudice. Therefore, we reverse the postconviction court's order in part, reinstating Mr. Brand's convictions but leaving undisturbed the court's grant of the right to file a belated motion for modification of sentence.[2]

## BACKGROUND

The underlying facts in this case are largely undisputed. Mr. Brand lived in the basement of a home belonging to his aunt, Rona Brand, and his uncle, Clyde Burrell. On April 16, 2018, Mr. Brand, for no apparent reason, shot and killed his aunt and uncle in their living room. Later that same day, Mr. Brand, in a statement to police detectives, admitted that he had shot them. He led them to the murder weapon, which he had hidden shortly after killing Ms. Brand and Mr. Burrell.

### Preliminary Proceedings

A six-count indictment was filed, in the Circuit Court for Baltimore City, charging Mr. Brand with two counts of murder in the first degree, two counts of use of a firearm in

---

[1] *Strickland v. Washington*, 466 U.S. 668 (1984).

[2] The State did not challenge the postconviction court's ruling that had granted Mr. Brand the right to file a belated motion for modification of sentence. Thus, the circuit court retains jurisdiction over his belated motion for modification of sentence, filed February 15, 2024, pursuant to the postconviction court's order, and held sub curia.

3

the commission of a felony or crime of violence, possession of a regulated firearm by a person previously convicted of a felony, and wearing, carrying, or transporting a handgun on his person.

On November 15, 2018, Mr. Brand, through counsel,[3] entered a plea of NCR. Later that month, the case was postponed so that Mr. Brand could be committed to the Department of Health for an examination to assess his competence to stand trial and his criminal responsibility for the offenses charged. On January 14, 2019, the State disclosed the report of its psychiatric expert, Travis Klein, M.D., opining that Mr. Brand was competent to stand trial and that, at the time of the offenses, he was criminally responsible. At a status hearing held two days later, on January 16, 2019, based upon the report, the circuit court found that, beyond a reasonable doubt, Mr. Brand was competent to stand trial. It noted that trial was scheduled on March 20, 2019.

On March 20, 2019, Mr. Brand "waived" *Hicks*[4] "to hire an expert," and his trial was postponed until June 19, 2019, to afford the defense time to obtain a psychiatric expert

---

[3] During both phases of trial, during his direct appeal, and during his postconviction proceeding, Mr. Brand has been represented by the Office of the Public Defender ("OPD"), except for a brief period when he initiated his postconviction proceeding by filing a pro se petition.

[4] This refers to the statutory requirement that a criminal trial be scheduled within 180 days of the earlier of the appearance of counsel or the defendant's first appearance before the court pursuant to Maryland Rule 4-213. Md. Code (2001, 2018 Repl. Vol.), Criminal Procedure Article ("CP"), § 6-103(a)(1)-(2); Md. Rule 4-271(a)(1). A defendant may consent to a postponement beyond that deadline (subject, of course, to the approval of the county administrative judge or designate on a finding of good cause), and, although the statutory requirement is not a personal right of the defendant, *Tunnell v. State*, 466 Md. 565, 587 n.28 (2020) (citing *State v. Brown*, 307 Md. 651, 656-57 (1986)), such a consent

(continued…)

and the expert's report. At a status hearing held that day, the court suggested that another postponement might be granted if the defense were unable to procure timely the expert's report.

On May 17, 2019, trial counsel designated the defense psychiatric expert, Solomon Meltzer, M.D. At that time, she did not disclose to the State the report required under Maryland Rule 4-263[5] because Dr. Meltzer had not yet submitted it and, in fact, would not complete his report until July 8, 2019.[6] Thus, when trial was called, on June 19, 2019, the prosecutor made a motion to exclude Dr. Meltzer's testimony because of the failure to submit his report.

Trial counsel explained to the court that she had just requested a postponement before the administrative judge but that her request had been denied.[7] The trial court replied

---

to a postponement commonly is called a "*Hicks* waiver," and it has the effect that a defendant may not obtain dismissal of the charges despite the technical violation of the rule. *White v. State*, 250 Md. App. 604, 627-28 (2021).

[5] Both at the time of trial and currently, Maryland Rule 4-263(e)(2)(B) requires a criminal defendant to disclose to the State's Attorney a copy of "all written reports or statements made in connection with the action by the expert," and section (h)(2) requires (unless the court orders otherwise) that the defense "make disclosure pursuant to section (e) of this Rule no later than 30 days before the first scheduled trial date[.]"

[6] Dr. Meltzer interviewed Mr. Brand on May 31, 2019, and he conducted a telephonic interview of Amy Brand, Mr. Brand's mother, on July 7, 2019, the day before he submitted his report.

[7] There was a suggestion that the administrative judge had changed the policy regarding postponements. Trial counsel alluded to the possibility of obtaining an "advance postpone[ment]" but that "under the new criteria" the case "[did not] fit." We note that, in Mr. Brand's direct appeal, he did not raise a claim that the administrative judge had abused her discretion in denying the June 19th postponement request. Brief of Appellant at 2,

(continued…)

that it had no authority to grant a postponement and that it was "time for trial now." Accordingly, the court granted the State's motion to exclude Dr. Meltzer. It then called a short recess so that trial counsel could confer with Mr. Brand about his options.

When the proceeding resumed, trial counsel requested the court to "consider doing the jury trial, and then holding the . . . NCR part with the Court deciding it at a later date[.]" The court countered with several suggested alternatives:

> So it is absolutely Mr. Brand's right to have me decide the NCR issue and not, um, and -- and it would basically just be holding it for disposition.
>
> Um, it's also the case that he has a right to plead guilty and defer disposition for NCR, in other words, you can plead -- you don't have -- you pled not guilty and that's also absolutely his right.
>
> You can plead guilty and defer for -- defer disposition, and I can push it back to my next collateral date, if that -- if that gives -- gives any help as well. It puts you back into July.
>
> Um, we, you know, I'm -- I'm at your disposal, but I think that is -- I do agree that's his right to have me decide the NCR issue . . . which would be essentially the same as deferring sentencing, assuming that there is a guilty verdict in this case.

Shortly thereafter, the court again summarized Mr. Brand's options:

> So, um, the other issue of course is, um, if -- if you have a jury decide the NCR issue, the reason we have the same jury hear the trial and hear the NCR issue is they hear the sort of background details that may contribute to the NCR finding.
>
> And so, if we, again, it -- we can have me as the finder of fact. We can have a jury as a finder of fact. You can do a guilty plea. And then, when we do the disposition you would -- you would want to put on maybe some fact

---

*Brand v. State*, No. 2048, Sept. Term, 2019 (Aug. 5, 2020). Nor, for that matter, did he, in his postconviction petition, raise a claim of ineffective assistance of appellate counsel for failing to raise this claim on direct appeal. Therefore, it is not before us.

6

witnesses to talk about his behavior at the time, or have me watch the [videotaped interrogation.]

* * *

Or have me watch the video of the interrogation as part of the NCR process, so I understand why you want those facts to come out.

But if you're not going to have the same jury deciding -- if you're going to have me doing the back end and the jury doing the front end, you don't necessarily get the same benefits from that is all -- is all I'm saying.

The parties and the trial court ultimately agreed that there would be a bifurcated bench trial to ensure that the defense would have an opportunity to properly present its NCR defense, which trial counsel characterized as "the most important part" of the case, as well as to have the same fact finder in both stages of the proceeding. Trial counsel conferred with Mr. Brand off the record to ascertain whether he would agree to waive his right to a jury trial. When the proceeding resumed, trial counsel expressed her preference that a "jury decide both the facts and the NCR portion of it, but given where we are, Mr. . . . Brand is electing to have a court trial." Trial counsel then conducted the waiver colloquy required under Maryland Rule 4-246, and upon its conclusion, the court accepted Mr. Brand's waiver.

**The Guilt-Phase Trial and the Court's Ruling**

The two-day guilt-phase bench trial began the following day. On the first day, the State presented its evidence, and on the second day, the trial court heard legal argument and thereafter rendered its verdicts. The State called eight witnesses, including several police officers, the lead detective, an assistant medical examiner (who performed the autopsies of the victims), a crime scene technician, Sanorico Curry (a friend of the

7

decedents and the only witness present at the scene at the time of the murders[8]), and Aaliyah Brown (the mother of Mr. Curry's child). The defense strategy was to concede that Mr. Brand had committed the shootings but that he was not criminally responsible. Thus, the defense called no witnesses.

The trial court summarized its factual findings as follows[9]:

> Um, there's no question, obviously, that, um, Ms. Brand and Mr. Burrell were killed by this multiple gunshot wounds.

> Um, Sanorico Curry who testified, uh, told the Court that he had been there that day. He'd had a heart to heart conversation with Mr. Brand. Um, didn't seem -- didn't notice anything out of the ordinary about Mr. Brand.

> Heard him go downstairs. He was looking at his phone. Wasn't sure about whether he came back up or not, but then he hears pops in the living room. He didn't count the number of pops that he heard, but it frightened him.

> He got up out of his chair and sort of tangled up with other chairs, heads into the living room and sees Mr. Brand coming back the other direction with the gun, a chrome handgun and hears Mr. Brand confess that he shot them.

> Then Mr. Curry goes into the living room, sort of losses [sic] track of what happens with Mr. Brand. He speaks, according to Mr. Curry, he speaks with Clyde Burrell briefly, and then he -- he's frightened, for obvious reasons, and he runs from the scene.

> Um, and in fact, Ms. Brown testifies later that she is heading back toward the house and sees him running, uh, a couple of streets away.

---

[8] There also was a two-year-old child (the granddaughter of the decedents) present, but she was not asked to testify. *See Stoddard v. State*, 389 Md. 681, 741 (2005) (discussing the competence of child witnesses).

[9] At no stage of the proceedings has Mr. Brand ever contended that any of the trial court's findings were clearly erroneous. Md. Rule 8-131(c).

Um, and then, the police are called and they find the bodies there with, unfortunately, the toddler in the room as well.

Mr. Brand, um, eventually he comes in contact with the police. I've reviewed the video where that happens. He's not wearing any shoes. He's not armed. He does speak, seemed to have, uh, a coherent conversation with the police who first encounter him. They take him into custody, but he's not handcuffed. He's just brought down to Homicide taken into an interview room where he gives a statement.

While Mr. Brand is anguished, and while the Court is not really qualified to do a mental health assessment of what was going on in his mind at the time, I see no indication that the statement was coerced or was otherwise involuntary. So I find that his statement to the police was voluntary.

Um, and in the statement he admits to the shooting. He admits to some hesitation before the shooting, but he says essentially he went downstairs, he got the gun, he came up, and he shot them. His motives being maybe obscure to everyone but him, but he shot them.

He then tells the police where the gun is.

When the gun is recovered exactly where he says it is, it has two spent shell casings in it. This is a gun that holds eight -- that holds six rounds, its capacity is six rounds. And the reason I inquired about that and checked it in the firearms report is that there are eight shots fired into the victims.

Um, and so finding two spent casings in there would indicate that after all six bullets were fired, the shell casing were emptied out, two more bullet[s] were put into the gun and two more shots were fired.

That in turn is significant, not only because it demonstrates premeditation, but because there was an inconsistency between Mr. Curry's testimony that he looked Mr. Burrell in the eyes and was able to exchange words with Mr. Burrell before he fled the house and Dr. Mourtzinos's testimony that the brain stem injury, the head injury to Mr. Burrell would have been instantly fatal.

Someone who has suffered a bullet wound to the brain stem as described, uh, in the, um, Medical Examiner's report is not having a conversation with anyone.

9

Um, which also supports the notion that this was a premeditated killing in the sense that it was wil[l]ful, deliberate and premeditated. The legal sense, someone who had time to think about the consequences of his actions, think about what he was doing and did it anyhow.

He fired multiple shots at multiple victims.

He did not shoot the little girl nor did he shoot Mr. Curry.

Um, he, after firing those multiple shots, he emptied out the ammunition from that -- from that weapon or emptied out the -- the spent casings from that weapon, and then fired two more shots, and then he had the presence of mind to leave the scene and hide the gun.

Whether in the legal sense Mr. Brand is criminally responsible for his actions is an issue for another day, and we will discuss that another day. Um, and it does seem to the Court that at least a fair question has been raised in that direction just by looking at his interview with the police.

But what's before the Court now is whether the State has proven beyond a reasonable doubt the elements of the offenses charged, and I can reach a verdict on that.

The trial court then found Mr. Brand guilty of the actus rei of all six charged offenses.

### Dr. Meltzer's Report

On July 8, 2019, Dr. Meltzer submitted his report, setting forth the results of his psychiatric evaluation of Mr. Brand. Dr. Meltzer opined that, although Mr. Brand was competent to stand trial, he was not criminally responsible for the offenses. Dr. Meltzer attributed Mr. Brand's actions to a "settled psychosis," which he inferred because Mr. Brand had purportedly stopped using cannabis "weeks prior to the shooting" but, nonetheless, "continued to have psychotic symptoms, long after the expected period of intoxication." According to Dr. Meltzer, Mr. Brand's medical records confirmed his conclusion because they indicated that Mr. Brand suffered from delusions on April 30,

10

2018, two weeks after the shootings, and Mr. Brand further reported, on May 16, 2018, that he felt that "others were going to harm him[.]" Thus, Dr. Meltzer concluded, "due to a mental disorder at the time of the offense, to a reasonable degree of medical certainty[,] Mr. Brand lacked substantial capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law."

## The NCR Trial and the Court's Ruling

A two-day NCR trial was held on September 17 and 18, 2019. During the first day, the parties presented evidence, and the following day, the court heard legal argument and rendered its verdict. The defense called two witnesses: Amy Brand, Mr. Brand's mother; and Dr. Meltzer, the defense psychiatric expert. The State also called two witnesses: Angeline Burrell, the victims' daughter; and Dr. Klein, the State's psychiatric expert.

Ms. Brand testified that, in July 2017, Mr. Brand stopped living with her and moved, first to live with a girlfriend, and then, either in October or November 2017, to live with the decedents. According to Ms. Brand, she saw Mr. Brand "around four or five times within that time[,]" during which she observed that Mr. Brand "seemed depressed" and "paranoid about things." In addition, Ms. Brand testified about Mr. Brand's erratic behavior during that time; for example, cutting off all his hair, repeatedly losing his bank card and phone, and "having problems on his job." Ms. Brand further stated that Mr. Brand "was saying a lot of unusual things"—that "people in the neighborhood" were "after him," and co-workers were "putting things in his drink" and were "out to get him[.]" According to Ms. Brand, she met Mr. Brand and her deceased sister (one of the victims) on Easter

11

Sunday, which that year was April 1, fifteen days before the shootings. She claimed that Mr. Brand "didn't look like he was on anything" but that, at dinner, he "just shut down."

Dr. Meltzer testified consistently with his report and stated that Mr. Brand suffered from "substance-induced psychotic disorder." Specifically, he said:

> Well, again, you know, I did understand that there was an aspect of this related to substance use and that his psychosis appeared to begin at the start of using cannabis. That being said, the psychotic symptoms that he described around the time of the offense, I thought that they were manifested long after he stopped using substances and persisted for a couple of weeks.
>
> In other words, it didn't seem to be acute intoxication leading to psychosis, but, rather, a psychosis that really persisted, which, you know, brings in the question of settled psychosis, which I felt that he did -- he did qualify for that based on that he continued to be psychosis -- psychotic long after using cannabis.
>
> * * *
>
> [Settled insanity] applies to a situation when somebody has used an intoxicating substance, such as marijuana, PCP, you know, an illicit substance such as that, that can cause a person to become psychotic. However, once they stop using the substance, there has to be psychosis that persists long after they stop, for a period of time after they stop, which is what happened in his case.

Dr. Meltzer testified that he ruled out the other possibility—that Mr. Brand, although psychotic at the time of the shootings, was "not NCR due to voluntary intoxication"—because, in his opinion, there was "a lot of evidence" that Mr. Brand "had stopped using drugs for weeks prior to the shooting." That evidence was based, primarily, upon Mr. Brand's repeated and consistent self-reporting, augmented by Mr. Curry's testimony that Mr. Brand had declined his offer to smoke cannabis on the day of the shootings. Further bolstering his conclusion, according to Dr. Meltzer, was that Mr. Brand's medical records

12

showed that his psychotic behavior "persisted," which indicated "ongoing psychosis." Dr. Meltzer acknowledged, however, that when he met Mr. Brand on May 31, 2019, during the two-hour-and-twenty-minute clinical interview, Mr. Brand did not exhibit any "active symptoms" indicating that he was suffering from psychosis.

Ms. Burrell testified that, on the morning of the murders, she had visited her parents' home to retrieve a package that had been shipped there. She was aware that Mr. Brand lived in the basement of the home, and according to her, Mr. Brand was using drugs, including cannabis, "[w]ithin days" of the shootings.

Dr. Klein, the State's psychiatric expert, a forensic and clinical psychiatrist at the Clifton T. Perkins Hospital Center, disagreed with Dr. Meltzer's diagnosis. Although his report was not included in the postconviction record, his trial testimony made clear that, in his opinion, Mr. Brand's psychosis was acute and that it dissipated shortly after he had stopped using drugs. In Dr. Klein's opinion, "[b]ut for [Mr. Brand's] use of drugs, he would not have had any psychotic symptoms at the time of the offense." According to Dr. Klein, the "only time that Mr. Brand ever presented as psychotic was in the hours immediately after the offense took place, when he first presented to Central Booking." But "[t]welve hours after he first presented to Central Booking, his symptoms completely resolved[,]" and "[a]t no other point in the available medical records, from April all the way to October of 2018, did Mr. Brand ever exhibit any psychotic symptoms." Moreover, Dr. Klein pointed out that, while Mr. Brand was at Perkins for evaluation, "not only was he not prescribed an antipsychotic medication, but his final diagnosis on discharge was only an adjustment disorder, which is essentially being stressed about a legal situation or a social

13

stressor." "There is no explanation for that extreme escalation in psychosis and very quick resolution[,]" opined Dr. Klein, "other than an acute intoxication[,]" which is not a mental illness.

The following day, the trial court pronounced its ruling:

So, I can say I think without contradiction, this portion of the case is a much more difficult decision for the Court to make than the first portion of the case.

There is no question, I think both experts agree that Mr. Brand was not in his right mind at the time that this took place, and it's been a tragedy for his whole family.

The question is both a factual and legal one, though, as to whether what caused him to be in that state meet[s] the State's legal definition for not criminal[ly] responsible, and in that case in this State we make the distinction between someone who has essentially an enduring, or what they call settled mental condition or a temporary or transient one.

In *Porreca*,[10] quoting the *Parker*[11] case, we make a difference between the direct result of intoxication which is voluntarily sought after and it[s] remote and undesired consequence. Certainly, this was undesired consequence but was this a remote consequence?

The parties I think agreed that there are really two things I need to look at in this case. First one, there's sort of the front end and the back end, the front end being how long after the ingestion of a potentially triggering intoxicate did this take place, and the back end being how long did it take for the symptoms to resolve.

I think from a factual standpoint, the back end question is an easier one to answer. Looking at the medical records in this particular case, it seems

[10] *Porreca v. State*, 49 Md. App. 522 (1981), *superseded by statute as stated in State v. Johnson*, 143 Md. App. 173 (2002), addressed the distinction between temporary insanity, caused by the voluntary consumption of intoxicants, and a settled condition of insanity, which, although caused by the voluntary consumption of intoxicants, persists after cessation of their use.

[11] *Parker v. State*, 7 Md. App. 167 (1969), *cert. denied*, 256 Md. 747 (1970), *cert. denied*, 402 U.S. 984 (1971).

apparent that the symptoms that Mr. Brand were displaying when he gives his statement it [sic] to police on the 16th dissipated pretty quickly after he was incarcerated.

He -- while there were references to treatment plans and history throughout, these murders happened on the day of April 16th, and the 6:04 p.m. April 17th medical note shows essentially a normal mental status exam, and the April 18th reports, which were the first really detailed reports, also show normal mental status exams.

So I'm satisfied in this case that whatever the cause of the psychosis, it had resolved within a day or two of his arrest, and so that factual finding was a little bit easier for the Court to make.

The question is was the psychosis the direct result of ingesting an intoxicate, or was it a remote consequence from prior drug abuse. That is a tougher question. In this case I have Mr. Brand's report to various people that he had stopped using drugs two or three weeks using anything -- Let me rephrase that, anything that could have triggered the psychotic episode, because I'm not counting the Buprenorphine, had stopped using drugs two or three weeks prior to these events.

Dr. Meltzer relied on this, as well as his determination that the psychotic symptoms lasted until April 30th in reaching his opinion. But Dr. Klein was very skeptical of this claim that he hadn't ingested anything for two or three weeks for two reasons.

First, there were reports that he had received from other people, calling into question Mr. Brand's denial. And, second, a two or three week break from the substance use was just inconsistent with the sudden increase in symptoms followed by a rapid decline in symptoms. This wasn't -- this was something where, in Dr. Klein's opinion, was just that's not the normal etiology for those kinds of symptoms.

I have testimony from Ms. Burrell that, first, Mr. Brand was apparently normal the morning of the 16th and, second, that he regularly consumed marijuana in the basement of the home, as least as recently as three days before the incident.

Ms. Burrell's child stays in that house during the day, and so she has reason, I think, to keep tabs on what's going on in that house. There's statements from Charles Burrell indicating regular use, and a history that's also inconsistent with [Mr. Brand's] self-report of his drug use.

15

And I have [Sanorico] Curry, and this was actually something I put in my notes back in the first half, that he was surprised that Mr. Brand declined the offer of marijuana indicating, as far as Mr. Curry was concerned, that the idea that Mr. Brand was abstaining from marijuana was news to him as of that day.

Also, and I only -- I don't put a lot of stock in this, but it's out there, that in Dr. Meltzer's report there is indication that he was using MDMA up into April of 2018, and MDMA was also something that could be a triggering substance, in the opinion of both experts.

So, what it comes down to is that I'm not persuaded by a preponderance of the evidence that Mr. Brand hadn't consumed anything for weeks prior to this episode.

I find it more likely, given the facts in this case that he had in fact consumed something shortly before this happened, the Loud, which may have been a doctored or tainted marijuana, and this ingestion pushed his sort of weakening grip on sanity to the breaking point on that particular day.

A substance induced psychotic episode ensued, but it was a temporary psychotic episode that resolved within a few -- within a day or two. But during the psychotic episode Mr. Brand killed Ms. Brand and Mr. Burrell.

Again, I have no doubt that Mr. Brand was not in his right mind when this happened, but his psychosis was temporary and short lived and so it does not meet the Maryland definition for not criminally responsible and I'm forced to find him criminally responsible for his actions in this case.

The court thereafter sentenced Mr. Brand to consecutive terms of life imprisonment, with all but thirty years suspended, for each count of first-degree murder; a concurrent term of five years' imprisonment, without the possibility of parole, for use of a firearm in the commission of a crime of violence; and a concurrent term of five years' imprisonment for

16

possession of a regulated firearm after having been convicted previously of a disqualifying offense.[12] The court merged the remaining offenses for sentencing purposes.

**Direct Appeal**

Mr. Brand appealed from the judgments, raising a single claim: that "the trial court err[ed] in failing to find that [Mr. Brand] was not criminally responsible at the time of the offense[s.]" Brief of Appellant at 2, *Brand v. State*, No. 2048, Sept. Term, 2019 (Aug. 5, 2020). Notably, Mr. Brand did *not* claim that the administrative judge abused her discretion in denying the June 19th postponement request, nor did he claim that his waiver of jury trial was not knowing and voluntary. *Id.* In a per curiam opinion, we affirmed the judgments. *Brand v. State*, No. 2048, Sept. Term, 2019 (filed Dec. 15, 2020) (per curiam). In rejecting Mr. Brand's appellate claim, we observed that, although the evidence that he presented, "if fully credited by the circuit court, would have been sufficient to support a finding that his psychosis was the product of settled insanity," the circuit court apparently found that "his evidence [was not] sufficiently persuasive." *Id.*, slip op. at 6. In other words, although Mr. Brand met his burden of production, he did not satisfy his burden of persuasion. *Id.*

---

[12] The trial court inadvertently failed to impose a term of probation when it imposed split sentences for the first-degree murders. Because that resulted in an illegal sentence, *Greco v. State*, 427 Md. 477, 513 (2012), the court subsequently corrected Mr. Brand's sentence by imposing a two-year term of probation for one of the counts of first-degree murder.

17

## Postconviction Proceedings

As previously noted, Mr. Brand, pro se, filed a postconviction petition, and following the appointment of OPD to represent him, a superseding petition. In his amended petition, Mr. Brand raised three claims of error, two of which are relevant here:

> Trial counsel rendered ineffective assistance for failing timely to file the defense expert's opinion and report on criminal responsibility, a failure that put Mr. Brand in the position of having to choose between, (1) waiving a jury in order to have any shot at prevailing on the plea of not criminally responsible ("NCR"), and (2) having a jury but without any chance of prevailing on the NCR plea.

> Notwithstanding counsel's timing filing error, having a jury for the NCR trial was still a possibility but for counsel's ineffective assistance in counseling a court trial rather than a guilty plea followed by a delayed NCR disposition.

As relief, Mr. Brand sought "a limited remand for an NCR trial before a jury[.]"

A hearing was held as provided under section 7-108 of the Criminal Procedure Article ("CP") of the Maryland Code (2001, 2018 Repl. Vol.) and Maryland Rule 4-406. At that hearing, two witnesses were called on behalf of the petitioner: trial counsel and Mr. Brand.

Trial counsel, an experienced trial attorney, stated that, nonetheless, she had never before tried a case that required her to obtain an expert witness. She testified that, once she received the January 14th report from Perkins, declaring that Mr. Brand was competent to stand trial, she consulted a senior attorney in the Forensic Division of OPD.[13] Shortly

---

[13] Trial counsel further acknowledged that, although no appearance had been entered for the Forensic Division senior attorney, and her name does not appear on the June 19th transcript, that attorney "sat with" trial counsel during the June 19th pretrial hearing and

(continued…)

afterward, that attorney gave her a list of possible experts. Trial counsel explained that her role was to contact people on the list, inform them of the scheduled trial date, ascertain whether they could "see [her] client and . . . prepare a report in time[,]" and if so, contact the Forensic Division, which would "send a retention letter." According to trial counsel, Dr. Meltzer was either the second or third prospective expert she contacted, but she did not recall whether she had contacted him before or after the March 20th hearing.[14] When asked whether she knew when Dr. Meltzer was "actually hired," trial counsel replied that she had "no idea" but that it was, "[p]resumably," shortly after she informed the Forensic Division that he was an acceptable expert.[15]

Trial counsel believed that the three-month period from March until June was sufficient time to obtain Dr. Meltzer's report and submit it to the State within the discovery deadline, which was "30 days before the trial date" of June 19. After accounting for those

---

advised her "as far as how we wanted to proceed." Mr. Brand also recalled having met the senior attorney, describing her as "the lady that was at [the NCR] trial . . . that my lawyer was talking to." The docket entries suggest that the senior attorney subsequently entered her appearance on behalf of Mr. Brand on September 16, 2019, the day before the NCR trial began, and the transcripts indicate that she was present during the NCR trial along with trial counsel.

[14] During the pretrial hearing on June 19, trial counsel stated: "On March 20th we were in trial, I requested a postponement. Mr. Brand waived Hicks to hire an expert[.]" That testimony supports an inference that Dr. Meltzer was not hired until after March 20.

[15] The postconviction court appeared to believe that trial counsel was expected to obtain a psychiatric expert as soon as the NCR plea was entered, on November 15, 2018. Postconviction counsel explained that, after a plea of NCR is entered, the defendant is sent to Perkins for a mental health evaluation. Only if the defendant is declared competent to stand trial does it become necessary to hire a defense psychiatric expert. In this case, Mr. Brand was found competent to stand trial on January 16, 2019.

thirty days, it left Dr. Meltzer two months to interview her client and submit his report to her. Trial counsel could not remember when she first learned that Dr. Meltzer had not interviewed Mr. Brand until May 31 (which would have alerted her to the impossibility of satisfying her discovery obligation), but she did recall that she did not follow up with Dr. Meltzer to ensure that he would submit his report within thirty days of the June 19th trial date.[16] And finally, trial counsel testified that she had hoped to obtain an "advance postpone[ment]" upon learning that Dr. Meltzer would not submit his report in time but that she was blindsided when a new circuit court administrative judge abolished the previous policy of allowing advance postponements.

Trial counsel further averred that her trial strategy was not to contest guilt and that her primary goal was to present an NCR defense, preferably to a jury.[17] Trial counsel testified that she "wasn't aware that you could plead guilty and then" subsequently have a jury trial for the NCR phase.

During cross-examination, trial counsel acknowledged that the State had made a plea offer, providing that Mr. Brand would plead guilty to first-degree murder and be sentenced to life imprisonment. She "convey[ed]" that offer to Mr. Brand but did not recommend that he accept it.

Mr. Brand testified that he "want[ed] a jury for [his] NCR" trial and that he recalled rejecting the State's offer of life imprisonment. According to Mr. Brand, when the subject

---

[16] Trial counsel stated that she "was just kind of hoping [that] everything worked out."

[17] Trial counsel opined that, in her opinion, "most judges are State oriented."

20

of jury trial waiver arose during the June 19th hearing, trial counsel did not discuss the possibility of pleading guilty and having a subsequent jury trial for the NCR phase. Mr. Brand averred that he would have pleaded guilty if he had known "that was the way to get a jury" for the NCR phase trial.

The postconviction court thereafter issued a memorandum opinion and order, granting relief on all three claims in Mr. Brand's amended petition. It found that trial counsel performed deficiently "in failing to obtain Dr. Meltzer's expert report in time." It further found that "her ineffectiveness prejudiced him by depriving him of his right to a jury trial at the NCR phase of his case." Thus, the postconviction court granted Mr. Brand "a limited re-trial before a jury solely on the NCR issue." As for Mr. Brand's claim based upon trial counsel's advisement to waive a jury trial so as to preserve the right to present an NCR defense at a delayed disposition, the postconviction court, citing Maryland Rule 4-314(a)(4),[18] found that trial counsel performed deficiently "by not understanding that [Mr. Brand] could have pleaded guilty and then have [a jury] determine the NCR issue[,]" thereby depriving Mr. Brand "of his right to a jury trial at the NCR phase." Therefore, the

---

[18] Both at the time of trial and currently, Maryland Rule 4-314(a)(4) provides:

(4) **If a plea of guilty is entered.** — If the defendant has entered pleas of both guilty and not criminally responsible by reason of insanity and the court has accepted the guilty plea, there shall be a trial on the issue of criminal responsibility unless the State stipulates to a finding that the defendant is not criminally responsible. Notwithstanding any other provisions of law, the defendant may appeal from the judgment, but only on the issue of criminal responsibility.

21

postconviction court ordered that "the same relief" be granted on this claim as on Mr. Brand's "first allegation of error: a limited retrial by jury on the NCR issue."

The State filed an application for leave to appeal, challenging both rulings. We granted the application and transferred the matter to the regular appellate docket.

## DISCUSSION

### Parties' Contentions

The State contends that the postconviction court erred both in finding that trial counsel performed deficiently and in finding that Mr. Brand established prejudice. According to the State, the postconviction court "committed two overarching errors": first, in attributing "fault to trial counsel for outcomes that were beyond her control" and "beyond the control of a reasonably competent attorney"; and second, in failing "to conduct a prejudice analysis in connection with either of the two alleged instances of deficient performance."

Regarding Mr. Brand's claim that trial counsel performed deficiently in failing to obtain Dr. Meltzer's report in time, the State asserts that the "evidence showed that trial counsel acted reasonably in relying upon Dr. Meltzer to diligently complete the report and upon an indication that a future postponement would be granted if additional time was needed." "The fault for the untimely report," maintains the State, "lies with Dr. Meltzer and not trial counsel." An expert's negligence, according to the State, "should not be imputed to trial counsel." Moreover, according to the State, trial counsel reasonably relied upon the circuit court's representation, during the March 20th status hearing, "that a future postponement would be given if additional time was needed for the expert."

22

As for Mr. Brand's claim that trial counsel performed deficiently in advising him to elect a bench trial rather than to plead guilty and have a deferred NCR trial before a jury, the State asserts two reasons why that claim fails: first, Maryland law was unclear at the time of Mr. Brand's trial as to whether a deferred NCR jury trial was available when a defendant pleads guilty to the actus rei of the offenses; and second, the trial judge did not actually offer the option Mr. Brand contends trial counsel should have sought, nor was the judge required to do so.

Finally, the State contends that the postconviction court erroneously applied a per se prejudice standard instead of the ordinary *Strickland* standard, which requires a postconviction claimant to show that, but for trial counsel's unprofessional error, the result of the proceeding would have been different.

Mr. Brand counters that the postconviction court correctly concluded that trial counsel performed deficiently in failing to obtain Dr. Meltzer's report in time. According to Mr. Brand, trial counsel "did not engage the expert witness promptly[,]" she "underestimated the time required for [him] to perform an examination of Mr. Brand and produce a report[,]" and "most significantly, trial counsel did not contact Dr. Meltzer prior to the discovery deadline or the trial date to ensure that the examination and report would be completed and received in time." Mr. Brand maintains that a "reasonably competent attorney would have acted more swiftly to engage an expert, contacted and followed up with the expert before the discovery and trial deadlines, provided more information to the judges when she requested a postponement, and would not have assumed that a postponement request would have been granted."

23

As for Mr. Brand's claim that trial counsel performed deficiently in advising him to elect a bench trial rather than to plead guilty and have a deferred NCR trial before a jury, he asserts that the postconviction court correctly determined "that Maryland Rule 4-314(a)(4) permitted a guilty plea to be followed by a jury trial at the NCR stage." Because it was undisputed that trial counsel's strategy was focused solely on the NCR stage and that both she and Mr. Brand wanted a jury to make that determination, he argues that trial counsel's failure to "recognize that, by electing to plea[d] guilty and deferring disposition, Mr. Brand could have had a jury trial for the NCR phase[,]" constituted deficient performance.

And finally, Mr. Brand contends that the postconviction court correctly concluded that trial counsel's two instances of deficient performance deprived him of his right to have a jury determine whether he was criminally responsible, which was prejudicial "in itself." According to Mr. Brand, when the loss of a defendant's right to a jury trial is attributable to trial counsel's deficient performance, we should either presume prejudice or find that such a deprivation causes "fundamental unfairness."

### Standard of Review

We review the postconviction court's factual findings for clear error, but we review without deference its "conclusions of law, including a conclusion as to whether the petitioner received ineffective assistance of counsel." *Ramirez v. State*, 464 Md. 532, 560 (2019) (citing *Newton v. State*, 455 Md. 341, 351-52 (2017), *cert. denied*, 583 U.S. 1067 (2018)).

24

**Ineffective Assistance of Counsel**

The Sixth Amendment to the Constitution of the United States, applicable to the states through the Due Process Clause of the Fourteenth Amendment, guarantees to an accused the right to assistance of counsel. Article 21 of the Maryland Declaration of Rights provides a commensurate guarantee. *See, e.g.*, *Blake v. State*, 485 Md. 265, 291 & nn.15-16 (2023). The right to counsel means "the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

We apply "a two-part test to determine when counsel's actions violate a defendant's constitutional right to effective assistance of counsel." *Blake*, 485 Md. at 292. "First, the defendant must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

"When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. Our "scrutiny of counsel's performance must be highly deferential." *Id.* at 689. To avoid "the distorting effects of hindsight," we

25

"reconstruct the circumstances of counsel's challenged conduct" and evaluate that conduct "from counsel's perspective at the time." *Id.* We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). To summarize:

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.

*Id.* at 690.

"[A]ny deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.* at 692. In the ordinary case,[19] a defendant claiming a violation of his right to counsel because of attorney error "must show that there is a reasonable probability that, but for counsel's unprofessional

---

[19] Under narrow circumstances, prejudice may be presumed. The Supreme Court of the United States has identified only three circumstances where prejudice may be presumed: actual denial of counsel, constructive denial of counsel, and counsel's actual conflict of interest. *Strickland*, 466 U.S. at 692 (stating that "[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice"); *id.* (stating that prejudice is presumed where a defendant "demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance" (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980))). For completeness, although not raised in this case, we note that the Supreme Court of Maryland has identified (as a matter of Maryland law) one additional circumstance where prejudice may be presumed: trial counsel's failure to file a motion for modification of sentence, despite a defendant's instruction to do so. *State v. Flansburg*, 345 Md. 694, 705 (1997).

errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

"Most important, in adjudicating a claim of actual ineffectiveness of counsel, a court should keep in mind that the principles . . . stated do not establish mechanical rules." *Id.* at 696. "Although those principles should guide the process of decision, the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.*

Because the defendant bears the burden to prove both elements of a *Strickland* claim, the failure to establish either element must result in the denial of his claim. *Id.* at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

**Analysis**

*Deficient Performance*

The State raises colorable arguments that the postconviction court erred in finding that trial counsel performed deficiently in failing to obtain Dr. Meltzer's report in time to satisfy the defense's discovery obligations. It is at least doubtful that Dr. Meltzer's tardiness in submitting his report should be imputed to trial counsel. Moreover, it is less than clear that it was objectively unreasonable for trial counsel to rely upon the circuit court's suggestion, during the March 20th status hearing, that another postponement might be forthcoming.

On the other hand, trial counsel hardly was a model of diligence in ensuring that a psychiatric expert be hired as soon as she was aware that one was required, nor did she

27

monitor that expert's progress with any urgency. Although the record is thin in this regard, there is at least some evidence that, as of March 20, trial counsel had not yet hired Dr. Meltzer, even though counsel had known for more than two months that an expert was required. Moreover, the postconviction court's apparent finding that trial counsel failed to monitor Dr. Meltzer's progress prior to the June 19th trial date to ensure that he would submit his report on time is not clearly erroneous.

The State also raises colorable arguments that the postconviction court erred in finding that trial counsel performed deficiently in advising Mr. Brand to elect a bench trial rather than plead guilty and have a deferred NCR trial before a jury. For one thing, it was not until *Hemming v. State*, 469 Md. 219 (2020), that is, *after* Mr. Brand's 2019 trial,[20] that the Supreme Court of Maryland clearly stated (albeit in dictum) that a defendant who "enters pleas of guilty and NCR . . . may have the NCR portion of the trial determined by a jury[.]" *Id.* at 263 n.17 (citing Md. Rule 4-314(a)(4)). That is presumably why, during the postconviction hearing, postconviction counsel relied upon a newspaper article about the infamous *Capital Gazette* mass shooting,[21] rather than *Hemming* itself, in trying to persuade the court that trial counsel should have known, in 2019, that a guilty plea,

---

[20] The Supreme Court of the United States has instructed us to make "every effort" to "eliminate the distorting effects of hindsight" and evaluate trial counsel's conduct from her "perspective at the time." *Strickland*, 466 U.S. at 689.

[21] The record in this case does not contain Defense Exhibit PC2, a newspaper article about the *Capital Gazette* trial. We may take judicial notice of the record in *State of Maryland v. Jarrod Ramos*, Case No. C-02-CR-18-001515. The record in that case reveals that, in 2019, Ramos's trial counsel recognized that he could plead guilty and request a deferred jury trial on the issue of criminal responsibility, although the NCR trial itself was not held until 2021.

followed by a delayed NCR jury trial, was a course of action available to Mr. Brand. We further agree with the State that it was far from clear that the trial judge offered trial counsel the option of having Mr. Brand plead guilty and then having a deferred NCR jury trial, given the judge's reference to his "collateral date" when laying out the available options.

Rather than grapple with the question of deficient performance, on which reasonable jurists might differ, we shall assume, without deciding, that trial counsel performed deficiently, either in failing to ensure that Dr. Meltzer submitted his report in time or in failing to advise Mr. Brand to plead guilty and seek a delayed NCR jury trial. Therefore, we turn our attention to the matter of prejudice.

*Prejudice*

*When Prejudice is Presumed*

Generally, a defendant raising a *Strickland* claim bears the affirmative burden of proving prejudice. *United States v. Cronic*, 466 U.S. 648, 658 (1984); *Ramirez*, 464 Md. at 562. There are narrow exceptions to this rule. *Ramirez*, 464 Md. at 564. Because the postconviction court in this case presumed prejudice, we shall discuss it.

The Supreme Court of the United States has identified three circumstances where a presumption of prejudice applies to an ineffective assistance claim: (1) actual denial of the assistance of counsel; (2) constructive denial of the assistance of counsel; and (3) counsel's actual conflict of interest. *Strickland*, 466 U.S. at 692; *Ramirez*, 464 Md. at 573. Actual denial means that "'counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding.'" *Walker v. State*, 391 Md. 233, 246-47

29

(2006) (quoting *Cronic*, 466 U.S. at 659 n.25).[22] Constructive denial occurs "'if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing[,]'" *id.* at 247 (quoting *Cronic*, 466 U.S. at 659),[23] or "where the accused faces circumstances in which it is not likely that any attorney could provide effective assistance." *Id.* (citing *Powell v. Alabama*, 287 U.S. 45 (1932)).[24] An actual conflict of interest occurs where a

---

[22] *Clark v. State*, 485 Md. 674, 708 (2023), provides a recent example of presumed prejudice because of the court's action (issuing an order prohibiting communication between trial counsel and the defendant during an overnight recess) preventing counsel "from assisting the accused during a critical stage" of trial. (Cleaned up.)

[23] After *Cronic*, this exception, where prejudice is presumed, was narrowed substantially. In *Cronic*, the Court cited *Davis v. Alaska*, 415 U.S. 308 (1974), as an example where the defendant had been "'denied the right of effective cross-examination'" which "'would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it.'" *Cronic*, 466 U.S. at 659 (cleaned up) (quoting *Davis*, 415 U.S. at 318). But two years later, the Supreme Court of the United States disavowed this reasoning in *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), holding (on direct appeal) that the denial of the right of effective cross-examination is a trial error, subject to harmless error analysis. *Id.* at 682-84. *See Walker*, 391 Md. at 247 (explaining that, "[s]ince *Cronic* was decided, the Supreme Court has made clear that the *Cronic* exception to the general rule requiring proof of prejudice based on deficient performance is a very narrow exception, and that for the exception to apply, the '[attorney's] failure must be complete'" (quoting *Florida v. Nixon*, 543 U.S. 175, 190 (2004))).

[24] *Powell* was an extreme outlier. In that case, three black defendants had been charged with the rape of "two white girls," charges that, at that time, subjected them to the death penalty. 287 U.S. at 49. "[U]ntil the very morning of the trial no lawyer had been named or definitely designated to represent the defendants." *Id.* at 56. An out-of-state attorney purportedly was appointed immediately prior to trial without any opportunity to investigate the case or even to familiarize himself with local procedure. *Id.* at 57. The Supreme Court observed:

> The defendants, young, ignorant, illiterate, surrounded by hostile sentiment, haled back and forth under guard of soldiers, charged with an atrocious crime regarded with especial horror in the community where they were to be tried, were thus put in peril of their lives within a few moments after counsel for

(continued…)

30

defendant "demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980)). "With the exception of these three situations, a defendant must articulate 'how specific errors of counsel undermined the reliability of the finding of guilt,' *i.e.*, the defendant must prove actual prejudice." *Walker*, 391 Md. at 247 (quoting *Cronic*, 466 U.S. at 659 n.26).

*Lost Opportunity*

Mr. Brand cites *Hill v. Lockhart*, 474 U.S. 52 (1985), to support his contention "that he need not show prejudice beyond the fact that he was deprived of his right to a jury trial." According to Mr. Brand, he "need not prove that he would have prevailed on his NCR claim if he had proceeded to trial in front of a jury" because, in the context of an ineffective assistance claim where trial counsel's deficiency results in the "loss of a desired procedure[,]" the prejudice suffered is the deprivation of the desired procedure, in this case his right to a jury trial.

At issue in *Hill* was whether and how *Strickland* applied to a claim of ineffective assistance alleging that trial counsel's erroneous advisement induced Hill to plead guilty. The Supreme Court of the United States held that the *Strickland* test applies to such a claim and that "to satisfy the 'prejudice' requirement, the defendant must show that there is a

---

the first time charged with any degree of responsibility began to represent them.

*Id.* at 57-58. Under such extreme circumstances, it is not surprising that the Supreme Court concluded that the defendants in that case had been constructively denied the assistance of counsel.

31

reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59.

There is a substantial difference between an attorney's deficient performance inducing a defendant to plead guilty and an attorney's deficient performance inducing a defendant to waive a jury trial; in the former case, the result is a loss of opportunity to have *any* fact finder adjudicate the case, whereas in the latter case, the result is that a *different* fact finder decides the case. Only in the latter case is there a trial record against which we can weigh prejudice. It therefore stands to reason that, where an attorney's erroneous advice induces a defendant to plead guilty, the appropriate measure of prejudice is to determine whether, but for the attorney's deficient performance, the defendant would have insisted on going to trial. We are not persuaded that *Hill* provides the proper test for prejudice in the present case, where a full NCR trial was held.

Generally, a loss of opportunity does not lead automatically to a finding of prejudice. For example, in *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), the Supreme Court of the United States rejected a per se prejudice rule in a case where trial counsel had failed to perfect an appeal, thereby depriving the defendant of the opportunity of a direct appeal. Specifically, the Court abrogated lower court decisions that had held that trial counsel "must file a notice of appeal unless the defendant specifically instructs otherwise" and that "failing to do so is *per se* deficient." *Id.* at 478. Rather, according to the Supreme Court, a court reviewing such a claim must "engage in the circumstance-specific reasonableness inquiry required by *Strickland*[.]" *Id.* Instead of a per se rule, the Court declared

that counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing.[25]

*Id.* at 480.

Perhaps the most common form of lost opportunity underlying ineffective assistance claims results from the failure of trial counsel to object to what otherwise would have been a reversible error. We are presented regularly with arguments that the remedy for such a deficiency by trial counsel is to place the defendant in the position he would have occupied were it not for trial counsel's error in failing to object—that is, but for trial counsel's unprofessional error, the defendant would have been awarded a new trial upon a successful appeal, and therefore, we should grant that remedy as postconviction relief. We regularly reject these arguments because to grant a new trial under such circumstances would render the contemporaneous objection rule meaningless.[26] Instead, the price to be paid for such a failure by trial counsel is to place the burden on the defendant to establish *Strickland*

---

[25] The Court acknowledged, however, that "courts evaluating the reasonableness of counsel's performance using the inquiry [it] described will find, in the vast majority of cases, that counsel had a duty to consult with the defendant about an appeal." *Flores-Ortega*, 528 U.S. at 481.

[26] As the Supreme Court of Maryland explained in *Newton*, in excusing non-preservation and awarding a new trial under such circumstances, we would be ignoring the admonition in *Strickland* that, in a prejudice analysis, we "should presume . . . that the judge or jury acted according to law." *Strickland*, 466 U.S. at 694; *Newton*, 455 Md. at 361. That is, if trial counsel had alerted the court to the error by contemporaneous objection, we presume that the court would have corrected the error, not that it would have overruled the objection. Only if the court overrules the valid objection is reversal on appeal mandated.

prejudice, whereas, had the underlying claim of error been preserved, the burden would have fallen on the State to establish that any error was harmless beyond a reasonable doubt. And that rule applies, generally, even to structural errors.[27] *Ramirez*, 464 Md. at 575; *Newton*, 455 Md. at 356-57.

*Preserved Claims of Structural Error on Direct Appeal*

The underlying error at Mr. Brand's trial implicates the structural error doctrine. Different rules—concerning such crucial procedural concepts as preservation and waiver—apply to claims of structural error raised at different stages of a criminal proceeding, including derivative claims (i.e., ineffective assistance claims) predicated upon an underlying structural error.

"[T]he term 'structural error' carries with it no talismanic significance as a doctrinal matter." *Weaver v. Massachusetts*, 582 U.S. 286, 299 (2017). It means simply that the prosecution "is not entitled to deprive the defendant of a new trial by showing that the error was 'harmless beyond a reasonable doubt.'" *Id.* (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). Thus, "in the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.'" *Id.* (quoting *Neder v. United States*, 527 U.S. 1, 7 (1999)). *See also Newton*, 455 Md. at 353-54.

---

[27] Thus far, neither the Supreme Court of the United States nor the Supreme Court of Maryland has ever held that, in all cases, a defendant claiming ineffective assistance based upon trial counsel's failure to preserve a claim of structural error must prove prejudice; however, there are no decisions in either court thus far holding to the contrary, at least since the trial error/structural error dichotomy was first articulated in *Arizona v. Fulminante*, 499 U.S. 279, 306-12 (1991).

*Unpreserved Claims of Structural Error on Direct Appeal*

With the exception of a class of rights, the rule of *automatic* reversal applies only to *preserved* claims of structural error; generally, an unpreserved claim of structural error is not reviewable as of right on direct appeal, but rather, is reviewable only for plain error. *Id.*; *Savoy v. State*, 420 Md. 232, 243 & n.4 (2011).

The exception to the preservation requirement applies to the narrow class of rights that are subject to the knowing and voluntary waiver standard of *Johnson v. Zerbst*, 304 U.S. 458 (1938). Those rights include the right to a jury trial.[28] Thus, a claim that a defendant's waiver of that right was not knowing and voluntary may be raised on direct appeal without an objection having been made at trial. For example, in *Hammond v. State*, 257 Md. App. 99, 121 (2023), we observed: "Unlike a claim that the procedure in Rule

---

[28] We assume without deciding that a claim that a defendant's waiver of counsel was not knowing and voluntary may be raised on direct appeal without regard to preservation. We have not located a decision that so states. Nevertheless, there is a long line of decisions addressing claims that a trial court failed to comply with the rule governing waiver of counsel (today Maryland Rule 4-215 and, prior to the 1984 re-codification, former Rule 723).

Moreover, it is undisputed that a claim that a defendant's "guilty plea was not knowing and voluntary implicates a 'fundamental right' subject to the *Johnson v. Zerbst* waiver standard." *State v. Smith*, 443 Md. 572, 606 (2015). We also assume without deciding that a claim of a constitutionally defective guilty plea does not require an objection to preserve the claim on direct appeal (in that case, through application for leave to appeal).

Other rights that may be waived only by a knowing and voluntary waiver include the Fifth Amendment right against self-incrimination, *Lee v. State*, 418 Md. 136, 149-52 (2011), the right to decide whether to plead guilty, *Machibroda v. United States*, 368 U.S. 487, 493 (1962), and the right to appeal, *Cubbage v. State*, 304 Md. 237, 240-48 (1985). *See Curtis v. State*, 284 Md. 132, 142-44 (1978) (discussing Supreme Court decisions applying the knowing and voluntary waiver standard).

4-246(b) was not followed [requiring the court to announce its decision on the record], a claim of a constitutional violation of the right to a jury trial does not require an objection to preserve the claim." If a violation of the right is established (that is, if the waiver is constitutionally infirm), the result is automatic reversal.

*Claims Raised for the First Time in Collateral Proceedings*

In postconviction proceedings, claims raised for the first time in a petition fall generally into three categories: those that are waived, those subject to a rebuttable presumption of waiver, and those that are not waived. Many claims, even those alleging the violation of a fundamental right, are waived if not raised at trial or on direct appeal. *State v. Rose*, 345 Md. 238, 248 (1997); *Curtis v. State*, 284 Md. 132, 147 (1978).

Those claims alleging a violation of a right so fundamental that it is governed by the knowing and voluntary waiver standard of *Johnson v. Zerbst* are presumably waived if not raised at trial or on direct appeal. CP § 7-106(b)(2); *Rose*, 345 Md. at 244; *Curtis*, 284 Md. at 148-49. A postconviction petitioner may rebut the presumption of waiver. *See, e.g.*, *Curtis*, 284 Md. at 150-51. If he fails to do so, he must prove that there were "special circumstances" excusing the waiver. CP § 7-106(b)(1)(ii).[29]

---

[29] In addition, there is a narrow exception that permits a postconviction court to consider a claim that may have been waived, regardless of whether it is governed by the knowing and voluntary waiver standard. "Notwithstanding any other provision of" the Postconviction Procedure Act,

> an allegation of error may not be considered to have been finally litigated or waived . . . if a court whose decisions are binding on the lower courts of the State holds that: (i) the Constitution of the United States or the Maryland Constitution imposes on State criminal proceedings a procedural or
>
> (continued…)

Finally, there is a narrow class of claims that generally may be raised for the first time in a postconviction petition because they could not have been raised previously. By far the most important and commonly asserted claim of this type is a claim of ineffective assistance of counsel, in violation of the Sixth Amendment and Article 21 of the Maryland Declaration of Rights. A claim of ineffective assistance may be raised for the first time in a postconviction petition because, with narrow exceptions, it may not be raised on direct appeal. *Mosley v. State*, 378 Md. 548, 562 (2003) (noting that "the adversarial process found in a post-conviction proceeding generally is the preferable method in order to evaluate counsel's performance, as it reveals facts, evidence, and testimony that may be unavailable to an appellate court using only the original trial record"); *In re Parris W.*, 363 Md. 717, 726 (2001) (noting that "[i]t is the general rule that a claim of ineffective assistance of counsel is raised most appropriately in a post-conviction proceeding"); *but see Parris W.*, 363 Md. at 727 (addressing an ineffective assistance claim on direct appeal because the record was sufficiently developed to permit consideration of the claim).

*The Structure of an Ineffective Assistance Claim*

It is important to distinguish between a claimed violation of the right to effective assistance of counsel (that is, an ineffective assistance claim) and the underlying claim or

---

substantive standard not previously recognized; and (ii) the standard is intended to be applied retrospectively and would thereby affect the validity of the petitioner's conviction or sentence.

CP § 7-106(c)(2). *See Unger v. State*, 427 Md. 383, 411-16 (2012) (applying CP § 7-106(c) to hold that a due process claim based upon giving advisory jury instructions was not waived because of a subsequent change in the law).

right alleged to have been violated because of an attorney's deficient performance. Typically, an ineffective assistance claim alleges that counsel failed to raise a claim in a prior proceeding, that counsel's failure to do so was objectively unreasonable, and that the defendant suffered prejudice as a result. An ineffective assistance claim is not the same as the underlying claim; at the postconviction stage, the latter claim typically has been waived. That is precisely why it is raised indirectly, as part of an ineffective assistance claim. And as we mentioned earlier, with narrow exceptions, an ineffective assistance claim requires that the defendant prove prejudice, regardless of the underlying claim or right that has been infringed. *Ramirez*, 464 Md. at 573-75.

In *Miller v. State*, 207 Md. App. 453, 459-65 (2012), *aff'd*, 435 Md. 174 (2013), we explained the difference between a claim that a guilty plea was not knowing and voluntary and a derivative claim of ineffective assistance attacking the guilty plea on the ground that trial counsel misadvised the defendant about the consequences of the plea. The former is based upon an alleged violation of due process, whereas the latter is based upon an alleged violation of the Sixth Amendment right to counsel. We said:

> From its introduction to its conclusion and at all points between, [*Denisyuk v. State*, 422 Md. 462 (2011), *abrogated by Miller v. State*, 435 Md. 174 (2013),] focused, as did [*Padilla v. Kentucky*, 559 U.S. 356 (2010),] before it, on the Sixth Amendment right to the effective assistance of counsel as measured by the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984). *Denisyuk*'s analysis focused exclusively on the professional performance of defense counsel, as measured not by pre-existing caselaw but by emerging bar association standards of professional responsibility.

> In *Miller*, by contrast, the issue before the lower court, the decision of the lower court, and the original opinion of this Court had absolutely nothing to do with the Sixth Amendment or with ineffective assistance of counsel. Our only concern in *Miller* was with the ultimate voluntariness of a guilty

plea, as measured by the seminal Maryland cases of *State v. Priet*, 289 Md. 267 (1981), and *State v. Daughtry*, 419 Md. 35 (2011). The exclusive focus in *Miller* was on the mind of the defendant, not on the professional performance of the lawyer. The latter, of course, may have some influence on the former, but such influence is by no means automatic and the two issues are far from the same. To compare *Denisyuk* with *Miller* is to compare apples and oranges.

*Miller*, 207 Md. App. at 460.

*Ineffective Assistance Claims Based Upon Underlying Structural Error*

In *Weaver v. Massachusetts*, the Supreme Court of the United States addressed whether a defendant who alleges ineffective assistance of counsel based upon trial counsel's failure to preserve a structural error must prove prejudice. In granting certiorari in that case, the Court intended, initially, to address the question in its broadest sense, but it ultimately rendered a narrower decision limited to the circumstances of that case. *Weaver*, 582 U.S. at 293-94. The underlying error in that case was the closure of the courtroom during jury selection, to which trial counsel failed to object. *Id.* at 294.

The Court explained that in addressing an ineffective assistance claim based upon an unpreserved structural error, it is important to recognize that "the reasons an error is deemed structural may influence the proper standard used to evaluate an ineffective-assistance claim premised on the failure to object to that error." *Id.* The Court divided structural errors into "at least" three types: (1) "if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other

39

interest";[30] (2) "if the effects of the error are simply too hard to measure";[31] and (3) "if the error always results in fundamental unfairness."[32] *Id.* at 295-96. The key characteristic shared by all these types of errors is that they "'affect[] the framework within which the trial proceeds'" and, for that reason, are not amenable to harmless error analysis. *Id.* at 295 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)).

The basic problem in reconciling the structural error doctrine with the *Strickland* prejudice analysis typically applied to an ineffective assistance claim is that it presents an all-or-nothing situation. Precisely because a structural error is not amenable to harmless error analysis, it likewise does not fit readily within the usual outcome-determinative *Strickland* prejudice test, whether the defendant can show a reasonable probability that, but for trial counsel's unprofessional error, the result of the proceeding would have been

---

[30] An example of this type of structural error is a violation of "the defendant's right to conduct his own defense, which, when exercised, 'usually increases the likelihood of a trial outcome unfavorable to the defendant.'" *Weaver*, 582 U.S. at 295 (quoting *McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984)). "That right is based on the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." *Id.* (citing *Faretta v. California*, 422 U.S. 806, 834 (1975)).

[31] An example of this type of structural error is a violation of the defendant's right to select his own attorney. *Weaver*, 582 U.S. at 295. In that case, "the precise 'effect of the violation cannot be ascertained.'" *Id.* (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149 n.4 (2006)). Accordingly, the prosecution will "find it almost impossible to show that the error was 'harmless beyond a reasonable doubt,'" and "the efficiency costs of letting the [prosecution] try to make the showing are unjustified." *Id.* at 295-96 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

[32] Examples of this type of structural error are the complete denial of counsel to an indigent defendant, or the trial court's failure to instruct a jury on reasonable doubt. *Weaver*, 582 U.S. at 296. Under those circumstances, "the resulting trial is always a fundamentally unfair one." *Id.*

40

different. *Weaver*, 582 U.S. at 309-12 (Breyer, J., dissenting). But the alternative, urged by defendants in this situation—to presume prejudice—would completely undermine the contemporaneous objection rule (at least for structural errors); in other words, to presume prejudice in this situation would treat an unpreserved structural error no differently than a preserved structural error.

The *Weaver* Court attempted to sidestep this all-or-nothing situation by adjusting the *Strickland* prejudice test. *Weaver*, 582 U.S. at 300-01. The Court drew from language in *Strickland*, which instructed lower courts not to apply the prejudice inquiry "in a 'mechanical' fashion."[33] *Id.* at 300 (quoting *Strickland*, 466 U.S. at 696). The Court began

---

[33] There was precedent for this. In *Nix v. Whiteside*, 475 U.S. 157 (1986), trial counsel threatened to withdraw his representation because his client intended to perjure himself on the stand. A lower federal habeas court, applying the "reasonable probability" standard, awarded a new trial. The Supreme Court of the United States reversed, holding that the trial was not fundamentally unfair and that, therefore, the defendant could not prove prejudice. *Id.* at 175-76; *see Lockhart v. Fretwell*, 506 U.S. 364, 370 (1993) (declaring that "[s]heer outcome determination . . . was not sufficient to make out a claim under the Sixth Amendment"); *Fretwell*, 506 U.S. at 370 n.3 (explaining that, in *Whiteside*, the Court "held that the respondent could not show *Strickland* prejudice merely by demonstrating that the outcome would have been different but for counsel's behavior").

In *Fretwell*, trial counsel failed to make an objection (a "*Collins* objection," named after *Collins v. Lockhart*, 754 F.2d 258 (8th Cir.), *cert. denied*, 474 U.S. 1013 (1985), *overruled by Perry v. Lockhart*, 871 F.2d 1384 (8th Cir.), *cert. denied*, 493 U.S. 959 (1989)) that would have rendered Fretwell ineligible for a death sentence under then-existing law, and he was sentenced to death. After exhausting his direct appeal, Fretwell filed a habeas petition, contending that his trial counsel was ineffective in failing to raise a *Collins* objection. A federal district court granted the petition, and the United States Court of Appeals for the Eighth Circuit affirmed, although, by that time, the Court of Appeals had overruled *Collins*. *Fretwell*, 506 U.S. at 368-69. The Supreme Court reversed, concluding that a mechanical application of an outcome-determinative standard would have granted Fretwell "a windfall to which the law does not entitle him." *Id.* at 369-70.

(continued…)

by considering the nature of the unpreserved structural error at issue and determined that "not every public-trial violation will in fact lead to a fundamentally unfair trial[,]" "[n]or can it be said that the failure to object to a public-trial violation always deprives the defendant of a reasonable probability of a different outcome."[34] *Id.* Thus, the Court assumed without deciding that Weaver could establish *Strickland* prejudice by showing either a reasonable probability that, but for his trial counsel's deficient performance, the result of his trial would have differed, or that, because of his trial counsel's deficient performance, his trial was fundamentally unfair. *Id.* at 300-01.

---

The Supreme Court subsequently has clarified that the *Strickland* "reasonable probability" test is the default prejudice test in assessing ineffective assistance claims but that there are narrow exceptions where a reviewing court must look beyond mere outcome determination. *See Williams v. Taylor*, 529 U.S. 362, 391 (2000) (explaining that, "while the *Strickland* test provides sufficient guidance for resolving virtually all ineffective-assistance-of-counsel claims, there are situations in which the overriding focus on fundamental fairness may affect the analysis"); *id.* at 393 (declaring that "[c]ases such as [*Whiteside*] and [*Fretwell*] do not justify a departure from a straightforward application of *Strickland* when the ineffectiveness of counsel *does* deprive the defendant of a substantive or procedural right to which the law entitles him"). *Accord Weaver*, 582 U.S. at 300 (declaring that "[i]n the ordinary *Strickland* case, prejudice means 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different'" (quoting *Strickland*, 466 U.S. at 694)).

[34] Among the reasons the Court concluded that a public-trial violation does not automatically result in a fundamentally unfair trial are that there may be some circumstances where a closure of the courtroom is justified, *Weaver*, 582 U.S. at 297; a violation can occur "simply because the trial court omits to make the proper findings before closing the courtroom, even if those findings might have been fully supported by the evidence[,]" *id.* at 298; and because the right "protects some interests that do not belong to the defendant." *Id.* The Court observed that a violation of the right to a public trial is classified as a structural error not because such a violation "renders a trial fundamentally unfair in every case[,]" but rather, "because of the 'difficulty of assessing the effect of the error.'" *Id.* (quoting *Gonzalez-Lopez*, 548 U.S. at 149 n.4).

42

Applying that test, the Court observed that Weaver offered no evidence (or even legal argument) to establish a reasonable probability that, had his trial counsel objected to the partial closure of the courtroom, the result of his trial would have been different. *Id.* at 303. And finally, the Court concluded that Weaver could not prove that his trial had been "fundamentally unfair." *Id.* at 304-05.

Decisions of the Supreme Court of Maryland are in accord with *Weaver*, generally requiring that a defendant prove prejudice when raising an ineffective assistance claim based upon an unpreserved structural error. In *Ramirez v. State*, 464 Md. 532, the defendant was on trial for armed robbery and related offenses. *Id.* at 539. During voir dire, the court asked the venire "whether they, their relatives, or their close friends had ever had experiences as victims of crime, defendants, or witnesses in criminal cases that would 'affect[ their] ability to render a fair and impartial verdict[.]'" *Id.* Juror 27 replied that, "approximately a year-and-a-half earlier, his apartment had been 'broken into[.]'" *Id.* at 539-40. The court followed up, asking "whether 'that experience[ would], in any way, affect [his] ability to render a fair and impartial verdict in this case[.]'" *Id.* at 540. "Juror 27 responded: 'I believe it would.'" *Id.*

Trial counsel did not seek to have Juror 27 stricken for cause, nor did she exercise a peremptory strike to exclude him from the jury.[35] *Id.* Later, after the jury had been empaneled, "'trial counsel advised the circuit court that Juror 27 'just vehemently started

---

[35] Indeed, trial counsel moved to strike Juror 25 for cause on the same ground, although Juror 25 had not answered any of the voir dire questions. *Ramirez*, 464 Md. at 540. Thus, it appears that, through inadvertence, trial counsel sought to exclude Juror 25 rather than Juror 27.

shaking his head and just looked right at [her] with not a very pleasant face[,]'" and, accordingly, she "moved to strike Juror 27[.]" *Id.* The circuit court deferred ruling on the motion to strike Juror 27 and "stated that it was up to trial counsel whether to re-raise the issue." *Id.* "Trial counsel did not renew the motion to strike Juror 27, or otherwise raise any issue as to Juror 27 after moving to strike him following jury selection." *Id.* The jury subsequently found Ramirez guilty of eleven offenses. *Id.*

After an unsuccessful direct appeal, Ramirez filed a postconviction petition, contending that trial counsel was ineffective for failing to move to strike Juror 27 for cause and for failing to exercise a peremptory strike to exclude him from the jury. *Id.* The postconviction court denied his petition, and this Court, after granting Ramirez's application for leave to appeal, affirmed. *Id.* at 540-41. Ramirez filed a petition for writ of certiorari, which the Supreme Court of Maryland granted. *Id.* at 541.

Ramirez contended before the Supreme Court that "the presumption of prejudice applies because trial counsel caused structural error—namely, the seating of a biased juror." *Id.* The Court rejected that contention. Although the Court acknowledged that trial counsel performed deficiently, it concluded that the case did not fall within any of the narrow circumstances where the presumption of prejudice applies and that, therefore, Ramirez bore the burden to prove prejudice. *Id.* And the Court further concluded that Ramirez failed to show prejudice, "given that the State offered strong—indeed, overwhelming—direct and circumstantial evidence of his guilt." *Id.*

Thus, even when there was reason to think that an attorney's deficient performance caused a defendant to be tried by a biased jury, the Supreme Court in *Ramirez* held that the

presumption of prejudice did not apply. In the present case, there is no reason whatsoever to believe that the fact finder was biased or that Mr. Brand did not receive a fair trial.

In *Newton v. State*, 455 Md. 341, trial counsel failed to object to the presence of an alternate juror during deliberations. *Id.* at 347-48. The jury found Newton guilty of attempted first-degree murder and related handgun offenses, and the court sentenced him to life imprisonment plus additional terms. *Id.* at 349. Newton appealed, raising several claims of error, and we affirmed the judgments in an unreported opinion. *Id.*

Several years later, Newton filed a postconviction petition, claiming, among other things, ineffective assistance of trial counsel for failing to object to the presence of the alternate juror during deliberations, and a direct claim that "the trial court erred in permitting the alternate to sit in on deliberations." *Id.* at 350. The postconviction court granted Newton's petition and awarded him a new trial. *Id.* The State filed an application for leave to appeal, and we granted the application and reversed in a reported opinion. *State v. Newton*, 230 Md. App. 241 (2016), *aff'd*, 455 Md. 341 (2017).

On certiorari review, the Supreme Court of Maryland affirmed. The Court made quick work of the direct claim (that the trial court erred in allowing the alternate juror to sit in on deliberations), observing that "[s]uch a challenge [was] not viable" because, under the postconviction waiver statute, CP § 7-106(b)(1), that claim was waived. *Newton*, 455 Md. at 352 n.5.

As for the claim of ineffective assistance of trial counsel, Newton did not assert that, had trial counsel objected to the presence of the alternate juror, the verdicts would have differed. Brief of Petitioner at 24-28, *Newton v. State*, No. 86, Sept. Term, 2016 (filed Mar.

45

3, 2017). Instead, he contended that prejudice should be presumed because permitting the alternate juror to be present during deliberations was a structural error (about which Newton would have been prohibited, under Maryland Rule 5-606(b)(1), from investigating), *id.* at 24-27, and in the alternative, that, had trial counsel objected, he would have been awarded a new trial upon a successful appeal. *Id.* at 27-28.

The Supreme Court of Maryland, applying *Weaver*, rejected Newton's assertion that prejudice should be presumed. *Newton*, 455 Md. at 356-57. The Court assumed for the sake of argument that the presence of the alternate juror during deliberations was a structural error, and it analyzed the claim that trial counsel had been ineffective under the same framework used in *Weaver*. *Id.* at 357.

Because Newton's trial counsel "consented to the alternate juror's presence during deliberations," and the court instructed all the jurors not to allow the alternate juror to participate in deliberations, the Court concluded that Newton could not show that his trial had been "fundamentally unfair."[36] *Id.* at 359-61. As for Newton's assertion that, had trial counsel "objected to the presence of the alternate, he would have been granted a new trial on appeal[,]" the Court observed that Newton's argument rested upon the assumption "that the trial court would have permitted the juror to sit in on deliberations over counsel's objection." *Id.* at 361. But that would run afoul of the presumption that trial judges act in

---

[36] Newton also claimed that appellate counsel had been ineffective for failing to claim, on direct appeal, that the presence of the alternate juror during deliberations was plain error. The Supreme Court held that Newton failed to show prejudice because he could not demonstrate a reasonable probability that the Appellate Court would have granted him plain error relief. *Newton*, 455 Md. at 362-66.

accordance with the law, as *Strickland*, 466 U.S. at 694, instructs, and the Court therefore concluded that Newton had failed to prove prejudice. *Newton*, 455 Md. at 361-62.

Even prior to *Weaver*, the Supreme Court of Maryland was unsympathetic to a claim that prejudice should be presumed when an attorney's deficient performance caused an unpreserved structural error. In *Redman v. State*, 363 Md. 298 (2001), *cert. denied*, 534 U.S. 860 (2001), *reh'g denied*, 535 U.S. 966 (2002), the defendant was charged with murder in the first degree and other offenses, and the State sought the death penalty. *Id.* at 301. His trial counsel was unaware that there is an automatic right to removal to another county pursuant to Article IV, § 8(b) of the Constitution of Maryland,[37] and Redman did not exercise his right to removal. *Id.* Redman was found guilty of first-degree murder and attempted first-degree rape, and he elected to be sentenced by the court, which imposed a sentence of life imprisonment without the possibility of parole for first-degree murder and a consecutive term of ten years' imprisonment for attempted first-degree rape. *Id.*

After unsuccessfully pursuing a direct appeal, Redman filed a postconviction petition, asserting that trial counsel had rendered ineffective assistance in failing to realize

---

[37] The provision at issue states:

> In all cases of presentments or indictments for offenses that are punishable by death, on suggestion in writing under oath of either of the parties to the proceedings that the party cannot have a fair and impartial trial in the court in which the proceedings may be pending, the court shall order and direct the record of proceedings in the presentment or indictment to be transmitted to some other court having jurisdiction in such case for trial.

Md. Const. art. IV, § 8(b).

that there was an automatic right to removal, and that had trial counsel properly advised him, "he would have 'demanded' to exercise" that right. *Id.* at 301-03. The postconviction court granted Redman's petition, declaring that trial counsel's failure to properly advise Redman "casts significant doubt upon the fundamental reliability of the proceeding[.]" *Id.* at 303.

We granted the State's application for leave to appeal and subsequently reversed the judgment of the postconviction court. *Id.* On certiorari review, the Supreme Court of Maryland affirmed. *Id.* As relevant here, the Supreme Court rejected Redman's contention "that prejudice should be presumed because the right of removal is a fundamental right or qualifies as a structural error not susceptible to establishing prejudice."[38] *Id.* at 303, 310-13. Instead, the Court applied the *Strickland* prejudice analysis and determined that Redman had failed to show prejudice. *Id.* at 313-15. The Court reasoned that Redman had not, in fact, been sentenced to death; that his trial counsel had "considered the costs and benefits of removal," had "conducted a professional and extensive voir dire examination of the jurors[,]" and had determined "that an impartial jury had been impaneled." *Id.* at 314. Thus, the Court declared, the record was "devoid of any evidence suggesting" that Redman had been denied a fair trial. *Id.*

---

[38] In a related vein, the Supreme Court of Maryland held, in *State v. Rose*, 345 Md. 238, that a defendant may waive a right, even if it is deemed "fundamental," through a mere procedural default. *Id.* at 248. (The fundamental right in that case was the right to have the jury instructed properly as to the presumption of innocence and the State's burden of proof.)

Just as the Court in *Redman* rejected the contention that the lost opportunity to have a different jury decide the case was per se prejudicial, so too in the present case, we disagree with the postconviction court's ruling that the lost opportunity to have a jury, rather than the court, decide the question of criminal responsibility was per se prejudicial. Rather, Mr. Brand was required to show that, had he been tried by a jury instead of the court, there is a reasonable probability that the verdict would have been different. That is the default rule for ineffective assistance claims. *See, e.g.*, *Correll v. Thompson*, 63 F.3d 1279, 1292 (4th Cir. 1995) (denying an ineffective assistance claim based upon trial counsel's misrepresentation to the court about "the basis for [Correll's] request to waive his right to a jury trial" and inadequate advisement "of the consequences of that decision" because the appellate court had "no doubt that had the case been presented to a jury the same result would have obtained" given the "overwhelming" evidence of Correll's guilt).

### The Claim at Issue in this Case

We emphasize that this is *not* a case where Mr. Brand claims that his waiver of jury trial was not knowing and voluntary. He did not raise that claim on direct appeal, Brief of Appellant at 2, *Brand v. State*, No. 2048, Sept. Term, 2019 (Aug. 5, 2020), nor did he raise it in his postconviction petition, nor has he made any attempt to rebut the presumption of waiver. Therefore, it is waived. CP § 7-106(b)(1)-(2); *McElroy v. State*, 329 Md. 136, 146-49 (1993).

As we have explained at some length, a claim that Mr. Brand's waiver of jury trial was not knowing and voluntary, if established on direct appeal, is a structural error that

49

would have resulted in automatic reversal.[39] But that is not the claim before us, which is a claimed violation of the Sixth Amendment right to the effective assistance of counsel—literally, that trial counsel rendered bad advice, and had she not done so, Mr. Brand would have demanded that a jury decide whether he was NCR. To prevail on that claim, Mr. Brand must show a reasonable probability that, but for trial counsel's deficient performance (which we assume for present purposes), the result of his NCR trial would have been different, that is, that he would have been found NCR. In accordance with *Weaver*, we shall address whether Mr. Brand has shown that the result of the proceeding was fundamentally unfair.

The postconviction court in this case applied a prejudice standard that would have been appropriate only if Mr. Brand's waiver of jury trial had been invalid. Nowhere in its analysis did the postconviction court address the evidence adduced at trial or whether, had Mr. Brand been tried by a jury, there is a reasonable probability that the verdict would have been different. Nor, beyond a single passing reference to fundamental unfairness as an alternative test for prejudice, did the postconviction court ever attempt to apply that test.

### *Whether Prejudice was Established in this Case*

We turn now to consider whether Mr. Brand has demonstrated a reasonable probability that, had he been tried by a jury instead of the court, the verdict would have

---

[39] Decisions reviewing the validity of a *Johnson v. Zerbst* waiver focus on whether the defendant was informed, in open court, about the differences between a jury trial and a bench trial, about the unanimity requirement, about the State's burden of proof, whether the defendant was presently under the influence of any drugs that might impair his ability to understand the proceedings, and whether the defendant had been coerced into waiving his right to a jury trial. *See, e.g.*, *Abeokuto v. State*, 391 Md. 289, 316-24 (2006).

been different or that, in any other way, the result of the proceeding was "fundamentally unfair." Throughout the postconviction proceedings, beginning in his amended postconviction petition, continuing in his legal arguments during the postconviction hearing, and culminating in his brief before us, Mr. Brand has made no attempt to do so. Instead, he contends that the lost opportunity to have a jury decide the NCR issue was per se prejudicial. Indeed, in his brief, Mr. Brand maintains that "it is not clear from the record that a different factfinder — a jury — would have reached the same conclusion as the trial judge on the NCR claim." But this flies in the face of what the Supreme Court has said about how to assess prejudice:

> In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law. **An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, "nullification," and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed.** The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. **It should not depend on the idiosyncrasies** [sic] **of the particular decisionmaker, such as unusual propensities toward harshness or leniency.** Although **these factors** may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they **are irrelevant to the prejudice inquiry.**

*Strickland*, 466 U.S. at 694-95 (emphasis added).

Mr. Brand's assertion that a jury may have reached a different decision in the NCR trial does not rise above the level of speculation. Because Mr. Brand bears the burden to demonstrate prejudice, *id.* at 687, and he has not even attempted to meet his burden, his ineffective assistance claim fails.

51

To confirm our conclusion, we outline briefly the evidence supporting the trial court's finding that Mr. Brand failed to carry his burden to prove, by a preponderance of the evidence, that he was not criminally responsible. CP § 3-110(b).

It was undisputed that the central issue in determining whether Mr. Brand was criminally responsible turned on whether he was suffering from an acute, drug-induced psychosis or from a settled insanity. The answer to that question depended, in turn, on when Mr. Brand last used drugs and when his psychotic symptoms abated. If Mr. Brand's psychotic symptoms persisted for several weeks or perhaps a month after the last time he consumed certain drugs (in this case, either cannabis, "Loud," or MDMA), then it was likely that he was suffering from a settled insanity at the time of the killings and, therefore, was not criminally responsible. On the other hand, if Mr. Brand's psychotic symptoms dissipated within a few days of his last drug use, then it was likely that he was suffering from an acute, drug-induced psychosis at the time of the killings and, therefore, was criminally responsible.

According to Dr. Meltzer, Mr. Brand's psychotic symptoms "were manifested long after he stopped using substances and persisted for a couple of weeks." But he based that conclusion substantially on Mr. Brand's self-reported use: the clinical interview with Mr. Brand, the phone interview with Mr. Brand's mother (who merely related what Mr. Brand himself had told her), and Mr. Brand's self-reports chronicled in his medical records.

Mr. Brand, however, made a number of inconsistent and contradictory statements regarding his drug use. He told Dr. Meltzer that he had stopped using "in the two- to four-week period[.]" He told Dr. Klein that "he was using at least Suboxone up to the day

52

prior to the offense." In late March 2018, approximately three weeks before the shootings, Mr. Brand told his mother emphatically that he was "not using drugs." The day after the shootings, Mr. Brand told correctional officers that "he was using heroin and an unidentified drug that he said made him have racing thoughts." Mr. Brand's cousin, Angeline Burrell, said that Mr. Brand had been using drugs "[w]ithin days" of the shootings, and she was "certain that he was still smoking marijuana."

There was evidence that Mr. Brand used a wide variety of drugs. He reported, variously, that he used marijuana, cocaine, heroin, Suboxone, "Molly," and a highly potent form of cannabis called "Loud." Mr. Brand admitted to Dr. Klein that he was using drugs "daily" and in "substantial" amounts while he was living with the victims. Moreover, Dr. Klein observed that he "had a 14-year history of selling cocaine."

Furthermore, there was considerable evidence that Mr. Brand's psychosis dissipated shortly after his arrest. While under medical observation during the period immediately following the shootings, Mr. Brand was never diagnosed with a psychiatric disorder, nor was he prescribed anti-psychotic medication, and he was discharged April 27, 2018, eleven days after the shootings. In fact, on April 19, 2018, three days after the shootings, Mr. Brand's treating physician recommended that he be discharged, which Dr. Klein characterized as "highly unusual" if Mr. Brand were suffering from psychosis. Dr. Klein quoted the report of that physician during the NCR trial:

> The patient is not exhibiting signs of psychosis. No signs of mania. He's oriented. His behavior is appropriate. His thought processes are logical. His thought content is unremarkable.

As Dr. Klein pointed out, that observation was not consistent with settled psychosis; rather, it supported his opinion that Mr. Brand was criminally responsible. Based on the record before us, we conclude that Mr. Brand has failed to establish a reasonable probability that, had his NCR trial been held before a jury rather than the court, the verdict would have been different.

Nor is there a scintilla of evidence that his NCR trial was "fundamentally unfair." The postconviction court did not address this as a separate basis for its finding of prejudice—for good reason. The trial judge in this case heard the testimony, weighed the evidence, and rendered his decision, while recognizing the burden of persuasion.

Mr. Brand has failed to show, in any substantive way, that the result of his NCR trial was fundamentally unfair.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS ASSESSED TO APPELLEE.**